IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DANIEL WHITING, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 06 C 3714 |
| ) | |
| HARLEY DAVIDSON FINANCIAL SERVICES, ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT DIRECT MERCHANTS BANK'S MOTION FOR SUMMARY JUDGMENT**

NOW COMES the Plaintiff, DANIEL WHITING, by and through his attorneys, Larry P. Smith & Associates, Ltd. and in response to the Motion for Summary Judgment filed by Defendant Allied Collections, states as follows:

**I. INTRODUCTION**

Defendant theorizes that Plaintiff made a mistake in adjusting his payments in order to take advantage of the relief provided soldiers that are called up to serve the country. Defendant claims that Plaintiff is the one who made the error, and he is now attempting to use the Fair Credit Reporting Act to obtain relief he would not otherwise be granted. Not only does Defendant fail to eliminate a question of fact as to who was at fault for erroneously entering the payment amount, but Defendant also fails to demonstrate that any reasonable investigation took place when deciding to continue to report the account with late payments, thereby damaging Plaintiff's credit rating for when he returned to the states after his tour of duty.

Defendant claims the reporting is accurate, yet a question of fact remains as to whether it is truly accurate and not misleading given that it appears the Defendant provided

1

incorrect information on the amount of regular payments to be made on Plaintiff's motorcycle loan. Defendant claims that its investigation was reasonable as a matter of law. Not only did Defendant perform the most minimal investigation procedure under the FCRA, but the people it disclosed as those with knowledge of the investigation process truly have no knowledge of the process at all. Defendant cannot claim the investigation was reasonable if the evidence put forth in this case demonstrates that nobody at Harley knows what kind of FCRA investigation was performed. Defendant also claims that any claimed damages do not relate to any error of the Defendant's when the Defendant's reporting most definitely was a substantial factor in bringing about the lost ability to obtain credit. For these reasons, and the reasons stated below, Defendant's motion for summary judgment should be denied.

## II.     FACTUAL BACKGROUND

On October 5, 2005, Dan Whiting reported to Fort Bliss, Texas for active military duty and subsequently, was sent to Iraq to serve. Defendant's Statement of Material Facts ("SMF") 21-22. While away, it was explained to Plaintiff that he could seek relief from his financial obligations under the Servicemembers Civil Relief Act, 50 App. USC §501 *et seq.*, (hereinafter "SCRA"), by lowering interest rates on his credit accounts to 6%. SMF 22. Whiting called his father, Ron Whiting, and had his father take care of contacting his creditors; GMAC for his auto loan, and Harley Davidson for his motorcycle. SMF 24, Plaintiff's Statement of Additional Facts ("SAF") 3, 5, 13. When Ron Whiting called Harley he spoke with a representative named Shawna Jones. He was directed to and did fax over his son's military orders to a number provided to him. SAF 5, 6 and 11. Harley provides the service of calculating the amended payments pursuant to SCRA rights, and puts that information regarding its calculation into the system it has that keeps account data. SAF 8.

After Ron Whiting faxed his son's orders, he had no further contact with Harley. Ron Whiting did not enter into any automated system or go to an on-line site for Harley. He did not have any authorization to do that and, moreover, did not know how. SAF 5, 6, 10, 11.

On November 10, 2005, another entry appeared on Harley's records that reflect that someone changed the monthly payment amounts so that $142.56 would be withdrawn for 20 consecutive payments. SAF 9. In the two months leading to that activity (October and November), Whiting was entitled to the benefits of the SCRA reduction, yet he made full monthly payment. The extra amount he paid would be applied to December's payment. SAF 14. Subtracting the amount Whiting overpaid from his monthly bill in December, Whiting owed $142.56 for the month of December. SAF 14. From that point until Dan Whiting's return to his home in March 2006, that aforesaid amount was paid dutifully to Plaintiff's Harley account. Meanwhile, Harley began reporting that Whiting was 30 and 60 days late on payments since the $142.56 monthly payments were not as much as Harley claims it was supposed to receive with the interest rate reduction from the SCRA. SAF 23, 24.

When Dan Whiting returned from Iraq, he noticed that his credit report reflected late payments from Harley. He called and spoke again to Shawna Jones and attempted to convince her that he should not have late payments reflected on his credit report. SMF 44. Then, pursuant to his rights under the Fair Credit Reporting Act, Dan Whiting sent written notice to Trans Union that he disputed the reporting of the Harley account and believed he should not have late payments. SMF 48. Shawna Jones received the dispute from Trans Union. She looked briefly looked through the one computer program that contains customer account history information. She did not review the entire history, but enough to determine

that the credit reporting was "accurate." SAF 16,18. Plaintiff's credit file continued to reflect the Harley account as a delinquent account. Shortly thereafter, Plaintiff was denied credit from Washington Mutual based upon his Trans Union report. At the time that Washington Mutual denied Plaintiff, Plaintiff's Trans Union file reflected there was only one other account with a serious delinquency, that of Hinsdale Bank. Yet that delinquency occurred in 2003, and the account had been paid and closed in November 2003. Harley was the only open and recent delinquency being reported at the time of Plaintiff's credit denial from WaMu. SAF 23, 24.

Plaintiff filed his claims under the FCRA alleging that Harley failed to conduct a reasonable investigation into how they were reporting this account. Defendant has filed the instant motion for summary judgment.

### III. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), a motion for summary judgment will only be granted

> if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c). To determine if summary judgment is appropriate, the court must look at the "evidence in the light most favorable to the non-moving party." *Unterreiner v. Volkswagen of America, Inc.,* 8 F.3d 1206 (7th Cir. 1993) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)).

IV.  **ARGUMENT**

    A.  **History and Intent of the Fair Credit Reporting Act.**

The Fair Credit Reporting Act ("FCRA") is designed to protect consumers from the reporting of inaccurate information in a credit report. The FCRA is to be liberally construed in favor of consumers, not in favor of the credit and credit reporting industries. *See Jones v. Federated Financial Reserve Corp.*, 144 F.3d 961, 964 (6th Cir. 1998); *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995); *Hovater v. Equifax Services, Inc.*, 823 F.2d 413, 417 (11th Cir. 1987); *Klapper v. Shapiro*, 586 N.Y.S.2d 846, 849 (N.Y. Sup. Ct. 1992). The FCRA's purpose is to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report. *Equifax Inc. v. Federal Trade Comm'n*, 678 F.2d 1047, 1048 (11th Cir. 1982) (quoting S. Rep. No. 91-517, 91st Cong., 1st Sess. 1 (1969)).

The FCRA was enacted in order to ensure that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner ***which is fair and equitable to the consumer***, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. 15 USC 1681(b) emphasis added. The FCRA was prompted by congressional concern over abuses in the credit reporting industry. In the FCRA, Congress has recognized the effect that credit bureaus play in collecting and transmitting consumer credit information, and the detrimental effects inaccurate information can visit upon both the individual consumer and the nation's economy as a whole. 15 U.S.C. 1681(b). See also *Cushman v. Trans Union Corp.*, 115 F.3d 220, 223 (3d Cir. 1997) (citing *Philbin v. Trans Union Corp.*, 101 F.3d 957, 962 (3d Cir. 1996)).

> **B. Defendant's Reporting was not Accurate as Plaintiff made all payments required on time, and any error in payment amount is attributable to Defendant.**

Plaintiff alleges in his Complaint that Harley violated § 1681s-2(b). This section sets forth investigation requirements for furnishers of information to the credit reporting agencies. This section requires the furnisher, Harley, upon receiving notice of a dispute from a credit reporting agency, to conduct a reasonable investigation and report the results back to the agency.

The threshold question that must be answered before the analysis of the investigation is whether the report contained *maximum possible accuracy*. Defendant asserts that it did not violate the Fair Credit Reporting Act because the information it was reporting on Plaintiff's credit report was technically accurate. However, Plaintiff asserts that the reporting did not rise to the level of maximum possible accuracy. Whether the reporting of a debt is so misleading so as to be inaccurate within the meaning of [the FCRA] is a question of fact. *Koropoulos v. Credit Bureau, Inc.,* 734 F.2d 37 (D.C.Cir.1984). Plaintiff contends that he made all of his payments on time and any error in payment amount is attributable to Defendant. Technically accurate information may still be considered inaccurate under the FCRA if the information could be interpreted as being misleading or incomplete. *Henson v. CSC Credit Services*, 29 F. 3d 280 (7th Cir. 1994).

In *Curtis v. Trans Union & Ford Motor Credit* 2002 U.S. Dist. LEXIS 23471 (ND. Ill., 2002), the court was faced with a similar situation as this pending matter. In *Curtis*, Trans Union reported that the plaintiffs' vehicle was repossessed. The plaintiffs, however, pointed out that they were in a legitimate dispute over payment of the balance of the loan with the furnishing company, Ford Motor Credit. The plaintiffs provided Trans Union with a

6

detailed dispute which resulted in both Trans Union and Ford Motor Credit verifying the repossession as an accurate reporting since Ford Motor Credit did, in fact, repossess the vehicle. Both defendants in their joint motion for summary judgment argued that the information was technically accurate and therefore, not actionable. The court disagreed and found that summary judgment was not appropriate on the issue of whether that report was accurate given the pending payment dispute between plaintiff and lender. *Id*.

In the instant case, Defendant was met with the dilemma of reporting a person who had obtained relief under the SCRA which allowed Plaintiff to lower his interest rate to 6% during the time he was on active duty in Iraq. The evidence, construed most liberally to the Plaintiff, reflects that after Plaintiff was called to service, he asked his father, Ron Whiting, to contact his creditors to obtain the benefits that he was entitled to under the SCRA. SAF 2. Ron Whiting called Harley from his office and spoke to Shawna Jones, who gave him a fax number to send his son's military orders. Ron Whiting subsequently faxed the orders to Shawna Jones on or about October 7, 2005. SAF 5. That was the last communication Ron Whiting had with Harley. He did not dial into an automated system, go on-line, or perform any other task regarding his son's loan with Harley. As Ron Whiting testified, he "wouldn't even know how to." SAF 6.

The evidence from the Defendant shows that someone named "Randall" called Harley on November 10, 2005. The evidence further states that "Randall" did not have any authority to make changes on Plaintiff's account. SMF 30, 32, SAF 10. Randall's call was transferred to another person within Harley. Then it appears that another unknown Harley representative made an entry into the system altering Plaintiff's payments to $142.56. The payments were dutifully made in that amount until Plaintiff returned from Iraq. No real

explanation is made of the entries or how the calculation was entered into the system to withdraw that amount for monthly payments. However, Defendant's paralegal, Nelia Anisio-Fowler explained that it would be Harley's policy to perform these calculations for its customers, and note in the system that such activity was done. Moreover, the amount of $142.56 was the difference between what Whiting had overpaid in the months of October and November and the December payment. Therefore, Whiting only owed $142.56 in December. A finder of fact could easily conclude that when the November 10th call came in, it was a Harley representative that changed all the remaining payments to $142.56 instead of just the December payment.

Harley seeks to blame Plaintiff for this mishap, yet viewing the evidence in the light most favorable to Plaintiff, there is no evidence to back up that allegation. Rather, Harley makes the self-serving statement that Plaintiff simply must be the one who made the mistake because their computers must be right. Plaintiff did nothing but make his payments to Harley every month on schedule.[1] Plaintiff did not have access to Defendant's system, Ron Whiting did not have authority or access into his son's account, and Plaintiff himself was serving in Iraq. The Defendant chose to report this account to the credit reporting agencies. When it opted to report the account, it undertook the obligation to do so with maximal accuracy. Defendant made the error here, and incorrectly seeks to shift the blame to Plaintiff. Plaintiff should not be penalized for Defendant's internal errors and have his report reflect late payments. At the very least, a fact finder must be the one to decide which testimony is more credible. There is therefore a question of fact as to whether the account was reported

---

[1] The Deposition of Shawna Jones reflected that there was a reporting of a late payment when Plaintiff's payment was processed late by Harley even though he sent it in on time. While Whiting sent in his payment electronically within the due date, it took Harley 4 extra days to update the information. This turned into a 30 day late. See Deposition of Shawna Jones, Attached to Defendant's Motion as Exhibit 6, pp. 37-38

inaccurately, or at the very least, was misleading, and summary judgment should not be granted on this basis as a matter of law.

    **C.    Defendant's Dispute Procedures were not reasonable.**

A furnisher of information to a consumer reporting agency has several duties under the FCRA. These include the duty to investigate disputed information and report results of an investigation:

> After receiving notice pursuant to section 611(a)(2) [15 U.S.C. § 1681i(a)(2)] of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall:
>
> (A)    conduct an investigation with respect to the disputed information;
> (B)    review all relevant information provided by the consumer reporting agency pursuant to section 611(a)(2) [15 U.S.C. § 1681i(a)(2)];
> (C)    report the results of the investigation to the consumer reporting agency;
> (D)    if the investigation finds that the information is incomplete or inaccurate, report those result to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis.

15 U.S.C. § 1681s-2(b)(1).

In its motion, Harley does not dispute that its duty to investigate pursuant to the FCRA must at the very least be reasonable. Indeed, case law confirms that a furnisher's investigation of a dispute must be reasonable. "Section 1681s-(2)(b)'s investigation requirement for furnishers 'is analogous to the requirement imposed upon credit reporting agencies under § 1681i(a) to reinvestigate a consumer's dispute regarding information contained in his credit report' and, therefore, furnishers of credit are required to conduct a reasonable investigation." *Evantash v. G.E. Capital Mortgage Services, Inc.,* No. 02-cv-1188, 2003 U.S. Dist. Lexis 23131, at *21 (E.D. Pa. Nov. 25, 2003) (quoting *Bruce v. First*

*U.S.A. Bank, Nat'l Ass'n,* 103 F.Supp.2d 1135, 1143 (E.D. Miss. 2000)). Though Harley is not a credit reporting agency, as stated above, its duty to reinvestigate under the FCRA is akin to that of a credit reporting agency. *Bruce v. First U.S.A. Bank, Nat'l Ass'n,* 103 F.Supp.2d 1135, 1143 (E.D. Miss. 2000). See also *Hinton v. USA Funds*, 2005 WL 730963 (N.D. Ill.)

In the instant matter, Harley disclosed Nelia Anisio-Fowler as a person with knowledge of how their credit reporting operates. However, in her testimony, Fowler admitted that she has minimal knowledge on the subject, was never trained, doesn't know if any Harley agents are trained, and has never seen the credit reporting in action. SAF 19-22. Shawna Jones testified that she does one thing: she checks on a computer system called "Daybreak" to see what the computer says, then reports in line with that. She does not go through the entire file history, does not know who some of the people are handling the reporting and does not know what all of the codes entered mean. SAF 16-18. Plaintiff avers that a reasonable investigation in this case need not go beyond Harley's own kept records on the account. Had Harley reviewed the entire file history for Plaintiff during its investigation, perhaps the miscalculation of the payment amount would have been revealed. Then perhaps not only the credit reporting problem, but also the payment error could have been corrected before Plaintiff's credit file was updated to show he missed payments for up to 60 days.

The requirement of reasonableness cannot usually be resolved on summary judgment. Whether such an investigation has been conducted is generally a question of fact for the jury. *Henson v. CSC Credit Services,* 29 F.3d 280, 287 (7th Cir. 1994). The Seventh Circuit has explained in another FCRA case:

> The determination of the "reasonableness" of the defendant's procedures, like other questions concerning the application of a legal standard given facts

10

> (notably negligence, a failure to exercise reasonable care), is treated as a factual question even when the underlying facts are disputed. It therefore cannot be resolved on summary judgment unless the reasonableness or unreasonableness of the procedures is beyond question.

*Crabill v. Trans Union, LLC,* 259 F.3d 662, 664 (7th Cir. 2001)(emphasis added). Accordingly, the issue of "reasonable procedures" is "a jury question in the overwhelming majority of cases." *Dalton v. Capital Associated Industries, Inc.* 257F.3d 409, 416 (4th Cir. 2001); *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir. 1995); *Cahlin v. General Motors Acceptance Corp.,* 936 F.2d 1151, 1158 (11th Cir. 1991).

Facts that may indicate unreasonableness include notification of a credit reporting problem and a recurrence of that problem. "A credit reporting agency that has been notified of potentially inaccurate information in a consumer's credit report is in a very different position than one who has no notice…[W]hen a credit reporting agency receives such notice, it can target its resources in a more efficient manner and conduct a more thorough investigation.' This standard applies equally to furnishers of information." *Betts v. Equifax Credit Information Services, Inc.,* 245 F.Supp. 1130, 1135 (W.D. Wash. 2003) (quoting *Henson v. CSC Credit Services,* 29 F.3d 280, 286-87 (7th Cir. 1994)).

In the case at bar, the case law establishes that Harley had the responsibility to perform a reasonable investigation that includes fairness, accuracy and equity to Whiting. Is it reasonable as a matter of law to conduct no more than a cursory and incomplete review of the account notes in a situation where the true history of the account reveals that there is more than meets the eye? When Harley received notice that Whiting had an issue with the fact that his account was being reported as late, Harley's representative, Shawma Jones, looked only to confirm that according to the computer, Plaintiff was late with payments. However, in reality, this was not a situation where a payment date was ignored or missed,

11

but rather an incorrect amount was being paid based upon a calculation that Harley was supposed to make for Plaintiff. Within a reasonable amount of time, Harley could have determined how the error occurred and could have corrected it before harming the credit of a person who thought he had dutifully set up twenty (20) proper and timely payments while he was overseas serving the country. Harley knew Whiting paid his account automatically and that his payments were made on time; Harley knew Whiting was going over seas and would have SCRA relief; Harley had but one place to look to see there was an error in the system as to how much was being paid. Instead, each of these factors were ignored. At the very least, fact finders may differ as to whether this was a reasonable investigation and response to the Plaintiff's dispute.

*Evantash, supra*, indicates that other duties besides investigation under Section 1681s-2(b)(1) must also be performed in a reasonable manner, including reporting the results of the investigation. In *Evantash*, the issue was not the adequacy of the investigation, but rather the inaccurate reporting that occurred following the investigation. The plaintiff requested several investigations of recurrent inaccurate information in her report. After the first investigation, the defendant instructed Trans Union to correct the plaintiff's report, which it did. 2003 U.S. Distr. Lexis 23131, at *3-*4. But then the defendant sent reporting tapes to Trans Union containing the original, incorrect, account information. *Id.* at 4. Trans Union reinserted the previous inaccurate information into the plaintiff's report. *Id.* In three subsequent investigations, the defendant instructed Trans Union to correct the report, however, the instructions were apparently ineffective, because Trans Union "verified" the incorrect information. *Id.* at *4-*5. Finally after yet another investigation, the process resulted in removal of the inaccurate information. *Id.* at *5-*6.

The court determined that the furnisher had not complied with the "investigation" requirement, even thought it had "responded to the ACDVs by sending short electronic messages notifying Trans Union to correct her credit report." *Id.* at *21-*22. Among other problems, the furnisher "did not telephone Trans Union or send it a facsimile," which were "the ordinary steps when a consumer continues to dispute the accuracy of the entry in her or her credit report." *Id.* at *22. Also, the furnisher had sent the inaccurate reporting tape, contradicting its reporting of results in the initial investigation. *Id.*

Whiting does not argue that Harley should have phoned or faxed Trans Union. When Harley "investigated" Plaintiff's dispute, it did not review its own internal records completely. Harley did not consider the possible internal errors that caused the reporting to be inaccurate. Rather, a cursory review of the recent account history was performed which reflected a lower payment amount was coming in every month (failing to acknowledge that the account was set up to automatically withdraw 20 payments in that same amount and that the payment change coincided with Harley receiving notice that Whiting was requesting relief under the SCRA. It seems reasonable to require that an investigation that considers fairness and equity to the consumer (as required by 15 USC 1681) would be performed before a decision is made to update a file in such a way that is sure to harm this person upon his return from active duty. Thereafter, a fair reporting of the account must ensue. Based on that, Defendant's motion should be denied.

### C. **The failure of Harley to fairly and accurately report Plaintiff's account after receiving notice of a dispute from a credit reporting agency has caused damages to the Plaintiff**.

Under 15 U.S.C. 1681, a Plaintiff is entitled to damages for credit denials, humiliation and mental distress. Actual damages such as humiliation and mental distress are

available to the consumer even where there is no pecuniary loss. *Fischl v. General Motors Acceptance Corp.,* 708 F.3d 143 (5th Cir. 1983). Under the FCRA, a Plaintiff is not required to produce evidence of emotional damages with a high degree of specificity. *Philbin v. Trans Union,* 108 F.3d 957 (3rd Cir. 1996). Many cases have established that while there may be no actual denial of credit, a consumer can still be damaged. *Anderson v. Conwood Co.,* 34 F.Supp. 2d 650 (W.D. Tenn. 1999) (actual damages awarded in absence of testimony other than worry, stress and anxiety); *Stevenson v. TRW,* 987 F.2d 288 (5th Cir. 1993); *Thompson v. San Antonio Retail Merchants Ass'n,* 682 F.2d 509 (5th Cir. 1982) ($10,000 actual damages for humiliation and mental distress even when no out-of-pocket expenses); *Morris v. Credit Bureau,* 563 F.Supp. 962 (S.D. Ohio. 1983); *Thomas v. Trans Union, C.A.,* No. 00-1150 (D. Or. 2002) (jury award of $5.3 million remitted to $1 million; $300,000 in compensatory damages for emotional distress damages); *Dalton v. Capital Assoc. Industries,* 257 F.3d 409 (4th Cir. 2001) (damages for loss of reputation are available under FCRA).

In the recent decision in *Wantz v. Experian*, 386 F.3d 829 (7th Circ. 2004), the Seventh Circuit held that in the absence of disclosure of the inaccurate information to a third party, a plaintiff cannot show that the FCRA reinvestigation requirement was violated. *Wantz*, at 834. Plaintiff here has gone beyond the requirement set forth in *Wantz*. In the case at bar, Plaintiff received a denial of credit from Washington Mutual on May 1, 2006, after Defendant's dispute investigation had been completed. The notification of denial lists as reasons for the denial as (1) serious delinquency, public record or collection; (2) time since delinquency too recent or unknown; and (3) number of accounts with delinquency. At that time, Plaintiff's credit report reflected that there was only one other account with a serious

14

delinquency, that of Hinsdale Bank. Yet that delinquency occurred in 2003, and the account had been paid (no longer delinquent) and closed in November 2003. Harley was the only open and recent delinquency being reported at the time of Plaintiff's denial of credit.

Furthermore, Plaintiff's father had viewed emotional distress and mental anguish in his son since the incident began. Ron Whiting testified that this incident caused Dan to be on edge, jump at his mother, and argue with his father to the point where was given medication to calm him. Defendant's Exhibit 7, p. 19. A fact finder may conclude that this is a sufficient showing of damages under the Fair Credit Reporting Act and as such, Defendant's motion should be denied.

## V. CONCLUSION

Harley appears to have created an accounting error in the handling of Dan Whiting's account and as a result of its mistake, has reported Plaintiff's account inaccurately. Dan Whiting requested an investigation to be performed under the Fair Credit Reporting Act. Harley failed to perform a reasonable reinvestigation into the account history, and has continued to report the account inaccurately by showing that Whiting "missed payments" on the account. This has caused harm to Whiting and has caused damage. Based upon the arguments above, Plaintiff respectfully prays that this Honorable Court deny Defendant's Motion for Summary Judgment.

                                                              Respectfully Submitted
                                                              **DANIEL WHITING**

                                                               By: _s/Larry P. Smith_
                                                                      Attorney for Plaintiff

LARRY P. SMITH & ASSOCIATES, LTD.
205 N. Michigan Ave., Suite 4000
Chicago, IL 60601
Phone: (312) 222-9028
e-mail: lsmith@lpsmithlaw.com