IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DANIEL WHITING,                        )
                                       )
                    Plaintiff,         )
                                       )
        v.                             )    No.  06 C 3714
                                       )
HARLEY-DAVIDSON FINANCIAL SERVICES,)
                                       )
                    Defendant.         )

MEMORANDUM ORDER

Daniel Whiting ("Whiting") has sued Harley-Davidson
Financial Services ("Financial Services"), alleging that
Financial Services willfully and negligently violated the Fair
Credit Reporting Act ("Act," 15 U.S.C. §§1681-1681u)[1] when it
reported assertedly "derogatory and inaccurate statements" about
Whiting's credit history to various credit reporting agencies (F.
St. ¶¶1-3).  Financial Services has now moved for summary
judgment under Fed. R. Civ. P. ("Rule") 56.  For the reasons
stated here, that motion is granted in part and denied in part.

Summary Judgment Standard

Every Rule 56 movant bears the burden of establishing the
absence of any genuine issue of material fact (Celotex Corp. v.
Catrett, 477 U.S. 317, 322-23 (1986)).  For that purpose courts
consider the evidentiary record in the light most favorable to
nonmovants and draw all reasonable inferences in their favor

_____

[1]  That and all other provisions of Title 15 will hereafter
be cited simply as "Section --," omitting the prefatory "15
U.S.C."

(Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)).[2]  But to avoid summary judgment a nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of material fact exists (Pugh v. City of Attica, 259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific facts that demonstrate a genuine issue of triable fact" (id.).  Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 466 U.S. 242, 248 (1986)).

What follows is a summary of the facts viewed in the light most favorable to nonmovant Whiting, but within the limitations created by the extent of his compliance (or noncompliance) with the strictures of LR 56.[3]  And that obviates any need, in the evidentiary recital, to repeat "according to Whiting " or the like or to identify any conflicting account, though inclusion of the latter is sometimes called for as a purely informational

---

[2]  As the later discussion reflects, it is important to honor the qualifier "reasonable" in that statement of the rule. Indeed, in the circumstances of this case that word bears emphasis.

[3]  LR 56.1 implements Rule 56 by requiring each party to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which are agreed upon. This opinion cites to Financial Services' statement and exhibits as "F. St. ¶--" and "F. Ex. --" respectively and to Whiting's response as "W. St. ¶--."  Additional statements that Whiting submitted in response to Financial Services' motion are referred to as "W. Add. St. ¶--."  Where an assertion in either party's LR 56.1 statement is undisputed by the opponent, the opinion includes only a citation to the original statement.

matter.

<u>                                                   Facts</u>

On April 9, 2005 Whiting purchased a 2004 Harley Davidson
motorcycle (F. St. ¶¶4, 6).  To finance the purchase Whiting
entered into a "Promissory Note (Simple Interest) and Security
Agreement" ("Agreement") with Eaglemark Savings Bank
("Eaglemark"), a subsidiary of Harley-Davidson Credit Corporation
(F. St. ¶4).  Under the Agreement Whiting agreed to repay a loan
of $15,420 over seven years at an annual percentage rate of
12.99% (F. St. ¶7), with interim monthly payments of $347.73 (F.
St. ¶8).

Before this opinion turns to the more essential facts of
this specific dispute, some explanation is in order as to how
Financial Services routinely handles accounts such as Whiting's.
First, it operates as the servicer of loans--such as
Whiting's--that originate with Eaglemark (F. St. ¶4; F. Ex. 5
¶4).  In that role it issues to borrowers monthly statements
regarding their accounts, with information as to the amount
currently owed, any late charges and any unpaid amounts from
prior statements (F. St. ¶10).

Second, for loan servicing purposes Financial Services
maintains a computer program that its customer service
representatives use to make notes whenever they communicate with
customers at either's instance (F. St. ¶11).  Those

notes--commonly referred to as "loan history notes"--are ordinarily made by the customer service representative right as the exchange with a customer takes place (F. St. ¶¶12-13).

Finally, Financial Services' customers can make loan payments in a variety of ways, including wire transfers, individual electronic transfers, personal checks, certified checks and money orders (F. St. ¶17). Alternatively they may use a "DirectPay" system that electronically debits loan payments from personal checking or savings accounts (F. St. ¶15). JP Morgan Chase, not Financial Services, administers the DirectPay system (F. St. ¶15; F. Ex. 5 ¶¶19-20).

With that as a background, it is time to explore Whiting's dealings with Financial Services. From May 2005 through November 2005 Whiting made all of his required monthly loan payments on time and in full (F. St. ¶19). About August 30, 2005 Whiting, who had enlisted in the United States Army Reserves in October 2002, was ordered to active duty (F. St. ¶¶20-21). In October 2005 Whiting reported to Fort Bliss, Texas, where he learned of benefits available to him under the Servicemembers Civil Relief Act ("Servicemembers Act," 50 App. U.S.C. §§501-596)(F. St. ¶22). Among those benefits was a limitation on the interest rate that a servicemember must pay during his or per period of military service (F. St. ¶26). Under the Servicemembers Act an active member of the military pays no more than 6% annual interest (50

App. U.S.C. §527(a)(1)).

From Texas Whiting was deployed to Iraq (W. Add. St. ¶2).
Before leaving Whiting set up his DirectPay account so that two
years' worth of payments would be withdrawn on a monthly basis
(id.).  During Whiting's absence his father, Ronald Whiting,
handled all of his son's financial matters and received and
reviewed his mail daily (F. St. ¶24; W. Add. St. ¶3).  About
October 5, 2005 Ronald Whiting called Financial Services to alert
them to his son's active military status and to have the interest
rate on his loan adjusted per the Servicemembers Act (F. St. ¶23;
F. Ex. 3 at 18 and 19).  Later the father also faxed a copy of
his son's activation order to Financial Services (W. Add. St.
¶¶6, 11-12).

Ronald Whiting testified, in response to the question "did
you have any further contact with Harley-Davidson after having
sent over that fax?" (his Dep. 12), "I don't believe so" (id.
13).  Although that "I don't believe so" cannot suffice to
undercut the only reasonable inference that can be drawn from the
evidence recounted a bit later as to a November 10, 2005
telephone call, the same cannot be said as to his more direct
disclaimer as to an October 6 letter sent by Financial Services
(the day immediately after the fax sent by Ronald Whiting).  In
that respect Whiting asserts that neither he nor his father ever
received that letter (W. Add. St. ¶3; F. St. ¶¶25, 27), which set

forth the new payment amount that would apply while Whiting
remained on active military status--$279.34 (F. St. ¶25). That
is of course hearsay as to Ronald Whiting and is hence
inadmissible (see Rule 56(e)), as is equally true of a number of
other statements by Whiting as to what his father assertedly did
or knew (or did not do or know).

But in this instance Ronald Whiting's own Dep. 12 disclaims
his ever having seen the letter--and that suffices for present
purposes even though Financial Services maintains that the
October 6 letter was sent pursuant to its ordinary course of
business and was mailed to the address that Whiting had provided
on his loan application (F. St. ¶¶25, 28)--the same address where
Ronald Whiting resided during the time period relevant to this
litigation (F. St. ¶29). True enough, Whiting does not dispute
the contents of the letter or the facts (1) that such a letter
would have been sent to the address listed on his loan
application and (2) that the address was also Ronald Whiting's
residence (W. St. ¶¶26, 28-29). Nonetheless, however improbable
Ronald Whiting's disclaimer of receipt of the letter may appear
to be, on the current motion his version must be credited.

As Ronald Whiting understood the situation, following his
telephone call Financial Services would calculate the new monthly
payment that Whiting owed while on active military duty and would
somehow arrange for that amount to be debited via the DirectPay

system (W. Add. St. ¶¶6, 8, 10).[4]  Ronald Whiting never attempted to make a debit adjustment on his own.  For one thing he lacked proper authorization to access his son's DirectPay account, and for another he did not know how to make the adjustment in any event (W. Add. St. ¶¶6, 10).[5]

On November 10, 2005 one other exchange as to Whiting's account took place with Financial Services (F. St. ¶30).  "Loan history notes" stored on Financial Services' computers reflect that someone referred to as "Randall" called Financial Services from phone number (708)423-5202 (id.), which Ronald Whiting described at his Dep. 16 as "my work number, one of my work

---

[4]  Whiting corroborates his father's belief that a Financial Services customer service representative was capable of making such a calculation with deposition testimony from Nelia Anisio-Fowler ("Anisio-Fowler"), a Financial Services employee who was disclosed pursuant to Rule 26(a) as a person with knowledge of "Harley-Davidson's practices regarding the credit reporting operations applicable to [Whiting's] account" (W. Add. St. ¶¶8, 19).  She testified that a Financial Services customer service representative could calculate a customer's monthly payment under the Servicemembers Act and provide the result of that calculation to the customer over the phone (W. Add. St. ¶8).  Having made that calculation, the customer service representative would then place a note regarding the newly calculated amount in that customer's computer file (id.).

[5]  Financial Services admits that it did not receive any documents from Whiting allowing anyone other than Whiting to have access to his loan information or to make changes to his account by telephone (F. St. Add. ¶10).  At the same time, Financial Services maintains that knowledge of his son's password would have allowed Ronald Whiting to have online access to his son's DirectPay account and that knowledge of his son's loan number and social security number would have provided Ronald Whiting with the same level of access over the phone (id.).

numbers."  According to that note "Randall" wanted to change the amount of the monthly payment to be withdrawn through the DirectPay system (F. St. ¶32).  That note then went on to say that "Randall" was transferred to a different extension where he could speak with a representative affiliated with the DirectPay system (F. St. ¶33; F. Ex. A to Ex. 5, HDFSI/Whiting 000028; F. Ex. 6 at 52; F. Ex. 6 at 80).  As indicated earlier, the only reasonable inference that can be drawn in this area is that "Randall" was indeed Ronald Whiting.[6]

Loan history notes next show that on the same day that "Randall" called, the amount to be debited automatically from Whiting's personal bank account via the DirectPay system was changed from $347.73 (the monthly payment Whiting had originally agreed to make) to $142.56 (F. St. ¶34).  That amount is well below the $279.34 figure that Whiting actually owed under the 6% interest rate mandated by the Servicemembers Act.

That result permits of only one reasonable inference:  that it was Ronald Whiting who engineered that change in the debited payments.  And that is quite apart from Financial Services' statement that its own employees cannot make any modifications to the DirectPay system, even upon customer request (F. St. ¶16),

---

[6]  Whiting seeks to deny the fact that "Randall" was transferred to a different extension to make the necessary adjustment (W. St. ¶33).  But none of the additional matters he asserts as the basis for his denial really contradicts Financial Services' statement (see W. Add. St. ¶¶5-11).

and that arranging "payment amounts...always remained [Whiting's] or his agents' responsibility" (F. Add. St. ¶6). In that regard it is noteworthy that although Whiting seeks to deny Financial Services' assertion that its employees cannot make modifications to the DirectPay system (W. St. ¶16), he does so by advancing matters that either do not support the denial or (as is the case with his assertion that his father communicated with Financial Services only on October 5, 2005) are inadmissible because they were made without "personal knowledge" (which is required by Rule 56(e)).

In principal part, then, Whiting acknowledges the contents of the loan history notes from November 10, 2005 (W. St. ¶¶30-32, 34-35). And as for any possible exception to that admission, although Whiting attempts to deny that his father ever spoke with Financial Services or a representative of the DirectPay program on that day (W. Add. St. ¶6), that attempted disclaimer is inadmissible because, as noted earlier, it was made without the requisite "personal knowledge."

In any event, Whiting continued to make monthly payments. In each of October and November 2005 he paid $347.73 despite the fact that he was already entitled to pay smaller amounts under the Servicemembers Act (W. Add. St. ¶14). But then in December 2005 the payment amount dropped to $142.56, reflecting his

"overpayments" in the two preceding months (id.),[7] and the same amount that the DirectPay system had been set up to debit automatically as of November 10, 2005 (F. St. ¶34). Even though that should have been only a one-month adjustment, with the monthly payments then reverting to the $279.34 figure, the amount debited each month continued to be $142.56 in January, February and March 2006 (F. St. ¶¶35, 37).[8]

In March 2006 Whiting was released from active duty (F. St. ¶39). Loan history notes show that later that month Whiting telephoned Financial Services because his monthly statement reflected a higher amount than he thought he owed while deployed (F. St. ¶40). At that time Whiting also advised the Financial Services customer service representative with whom he spoke that he was no longer on active military duty (F. St. ¶41). That representative told Whiting that another customer service representative, Shawna Jones ("Jones"), would be in touch with him because Jones handles all matters related to the Servicemembers Act for Financial Services (F. St. ¶42).

---

[7] Whiting paid $347.73 in both October and November 2005, for a total of $695.46. Had he instead paid $279.34 in each of those months, that total would have come to $558.68--a difference of $136.78. When that overpayment total is subtracted from the proper monthly payment of $279.34, the result is $142.56--the exact amount paid in December 2005.

[8] On the present record, with only the fact but not the content of the November 10, 2005 conversation or conversations in which Ronald Whiting took part being established, the cause of that error has not been shown.

Further loan history notes show that Jones and Whiting spoke on April 10, 2006 (F. St. ¶44). During that conversation Whiting asked Jones to remove any negative credit information from his account (id.). When Jones told Whiting that the information could not be changed, Whiting told her that he would handle the matter in "another way" (F. St. ¶45).

On April 7 Whiting had again made a payment of $142.56 through the DirectPay system (F. St. ¶46)(no additional payment was made that month toward the balance of his loan)(F. St. ¶¶46-47). Then on April 12 Financial Services received notice from a credit reporting agency that Whiting disputed information on his credit report stemming from his tradeline with Financial Services (F. St. ¶48). In response Jones reviewed Whiting's account history and told the credit reporting agency that the information regarding his account was being reported accurately and that it did not need to make any changes (F. St. ¶49).

Financial Services later received two additional notices from credit reporting agencies reflecting the existence of Whiting's dispute (F. St. ¶50, 57). In both instances Jones conducted investigations similar to what she had done in response to the April 12 notice and reported the same result (id.).

On May 8, 2006 Whiting once more made a $142.56 payment through the DirectPay system (F. St. ¶51). On May 17 he telephoned Financial Services so that he could adjust the amount

that would be automatically debited in the future via DirectPay
(F. St. ¶52). Whiting was given a different number to call to
make that change (F. St. ¶53). Loan history notes on the next
day (May 18) show that the monthly payments to be debited
automatically through the DirectPay system had been readjusted to
$347.73 (F. St. ¶54).

On May 19 Whiting was debited through the DirectPay system
for $205.17--the difference between $347.73 and $142.56 (F. St.
¶¶55-56). Beginning in June 2006 and continuing through
September of that same year, Whiting made the proper $347.73
monthly payments with no incident (F. St. ¶¶58-59, 62).

In November 2006, after having filed this action against
Financial Services, Whiting purchased a condominium (F. St. ¶63),
financing the purchase with the aid of a mortgage he was able to
secure after first having been denied credit by Washington Mutual
(F. St. ¶¶64-65). According to the letter that Washington Mutual
gave Whiting explaining its decision, the denial of credit was
due to "[s]erious delinquency, and public record or collection
filed," "[t]ime since delinquency is too recent or unknown" and
"[n]umber of accounts with delinquency" (Ex. 6 to F. Ex. 3). At
the time Washington Mutual reviewed Whiting's credit application,
his credit report reflected one account other than that of
Financial Services that had been in serious delinquency (W. Add.
St. ¶24). But that delinquency had occurred in 2003, and by

November of that same year Whiting had paid off any outstanding balance and closed the account (id.). Whiting asserts that Washington Mutual must have denied him credit on the basis of his Financial Services account, the only "recent" delinquency at the time of his credit application (id.).

In addition to the denial of credit, Whiting alleges that his dispute with Financial Services caused him emotional distress (W. St. Add. ¶25). Deposition testimony from Ronald Whiting corroborates Whiting's assertion (id.). According to that testimony Whiting's dispute with Financial Services caused him to "be on edge" and "jump at his mother" (F. Ex. 7 at 19). Ronald Whiting continued (id.):

> Me and him would get in arguments. You know, I take
> Vicodin on a daily basis, and I even gave him a couple
> to kind of slow him down a little bit....[H]e gets on
> edge.

Ronald Whiting also added that the dispute with Financial Services was not the only source of stress in his son's life at that time (id.).

## Accuracy of Whiting's Credit Report

So much then for the factual foundation on which this opinion must be built. On to the legal analysis.

Whiting brought this action pursuant to Sections 1681n and 1681*o,* which provide a private cause of action for willful and negligent violations of the Act. In particular Whiting alleges that Financial Services violated Section 1681s-2(b)(1):

After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall--

> (A) conduct an investigation with respect to the disputed information;

> (B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;

> (C) report the results of the investigation to the consumer reporting agency; and

> (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis.

Put somewhat more simply, under Section 1681s-2(b)(1) a furnisher of information such as Financial Services must, as Buxton v. Equifax Credit Info. Servs., No. 02 C 6288, 2003 WL 22844245, at *2 (N.D. Ill. Dec. 1) has put it:

> after receiving notice from a consumer reporting agency, [ ] conduct an investigation regarding the disputed information, review all relevant information provided by the credit reporting agency, report the results of the investigation to the credit reporting agency, and report the results to other credit reporting agencies if the original information was incomplete or inaccurate.

Accord, Hinton v. USA Funds, No. 03 C 2311, 2005 WL 730963, at *5 (N.D. Ill. March 30), quoting Donley v. Nordic Props., Inc., No. 99-4677, 2003 WL 22282523, at *5 (N.D. Ill. Sept. 30).

Given the language of Section 1681s-2(b)(1) and the

consistent manner in which it has been read by other courts, this
Court is a bit perplexed by both parties' insistence that Whiting
bears an initial burden of showing that the information reported
by Financial Services and reflected in his credit report was
indeed inaccurate <u>before</u> the reasonableness of Financial
Services' post-notification investigation can be examined (see F.
Mem. 6-7; W. Mem. 6-9; F. R. Mem. 2-3). <u>Henson v. CSC Credit
Servs.</u>, 29 F.3d 280, 284 (7th Cir. 1994), on which Financial
Services relies primarily in staking out that position, involved
a different section of the Act: Section 1681e(b). That
provision pertains not to entities that furnish information to
credit reporting agencies but to the credit reporting agencies
themselves (see <u>Mann v. Experian Info. Solutions</u>, No. 02 C 7694,
2004 WL 432498, at *4 n.10 (N.D. Ill. Feb. 19), distinguishing
between suits brought under the Act and involving credit
reporting agencies and suits involving entities that furnish
agencies with information).[9]

Hence it is under Section 1681e(b), not Section 1681s-2(b),

---

[9] <u>Molton v. Experian Info. Solutions</u>, No. 02 C 7972, 2004 WL
161494 (N.D. Ill. Jan. 21), which Financial Services relies on
heavily in its reply brief, is similarly inapposite. Like
<u>Henson</u>, <u>Molton</u> also involved a suit against a credit reporting
company and was brought under Section 1681e(b)(<u>id</u>. at *4). Cases
cited by Whiting are distinguishable for the same reason (see W.
Mem. 6-9, citing Koropoulos v. Credit Bureau, Inc., 734 F.3d 37,
39 (D.C. Cir. 1984) and Curtis v. Trans Union, LLC, Nos. 02 C 207
and 02 C 209, WL 31748838 (N.D. Ill. Dec. 9), both involving
suits under Section 1681e(b) against credit reporting agencies).

that "a consumer must sufficiently allege 'that a credit reporting agency prepared a report containing "inaccurate" information'" (Henson, 29 F.3d at 284, quoting Cahlin v. Gen. Motors Acceptance Corp., 936 F.2d 1151, 1156 (11th Cir. 1991)). Once such a showing is made, the consumer reporting agency can avoid liability by demonstrating that "it followed 'reasonable procedures to assure maximum possible accuracy'" (id., quoting Section 1681e(b)).

In contrast, the same predicate showing is not required when Section 1681s-2(b) is at issue. Instead, as is clear both from the plain language of Section 1681s-2(b) and from the reading of that language in Buxton, Hinton and Donley, once a furnisher of information receives notice of a dispute from a credit reporting agency the Act mandates that the furnisher reasonably investigate the particulars of the dispute. Nothing in Section 1681s-2(b) calls on the consumer to demonstrate first that a genuine inaccuracy underlies the dispute before an investigation must ensue. And that reading of the statute makes perfect sense: After all, the very purpose of the investigation is to determine whether an inaccuracy exists.

Reasonableness of Financial Services' Investigation

This opinion therefore now turns to the question whether, as a matter of law, Financial Services reasonably investigated Whiting's dispute. As noted earlier, Whiting's Complaint alleges

16

that Financial Services violated Section 1681s-2(b) by both

willfully and negligently failing to comply with its duties under

the Act.  Section 1681n provides consumers with a claim for

willful violations of the Act, while Section 1681*o* does the same

as to negligent violations.  Separate analyses are required to

determine whether summary judgment is appropriate for the

respective claims--willful violation or negligent violation (see

Hinton, 2005 WL 730963, at *6-*7).

Willful Violation

As for the purported willful violation, Seventh Circuit

caselaw as reported in Hinton, id. at *6 (brackets in original)

"generally teaches...that summary judgment is to be used

sparingly in the context of claims involving questions of

intent," but summary judgment can be proper "even when issues of

[intent] are involved, if in response to a properly supported

motion for summary judgment, the non-movant offers no specific

facts to show that there is a genuine issue for trial."  To

survive summary judgment as to a willful noncompliance claim,

"the plaintiff must set forth some 'evidence demonstrating

conscious disregard or deliberate and purposeful actions'" (id.,

quoting Spector v. Experian Info. Servs., Inc, 321 F.Supp.2d 348,

357 (D. Conn. 2004); see also Zahran v. Trans Union Corp., No.

01 C 1700, 2003 WL 1733561, at *7 (N.D. Ill. March 31), holding

that "plaintiffs must set forth evidence that shows deliberate

and purposeful actions taken against them").

In terms of that framework it is clear that Whiting has produced no evidence that Financial Services willfully failed to comply with Section 1681s-2(b). Just as was the case in Hinton, 2005 WL 730963, at *7, the undisputed evidence here establishes that Financial Services conducted several investigations after learning of Whiting's dispute. Because Whiting has not "argued in any meaningful way--let alone produced evidence--that [Financial Services] willfully failed to comply with Section 1681s-2(b) during the course of these investigations" (id.), there is no genuine issue of material fact on that score. Hence Financial Services' motion for summary judgment as to Whiting's claim of a willful violation is granted.

Negligent Violation

This opinion turns next to whether summary judgment is also appropriate as to Whiting's claim that Financial Services negligently violated Section 1681s-2(b). As Westra v. Credit Control of Pinellas, 409 F.3d 825, 827 (7th Cir. 2005), citing Crabill v. Trans Union, L.L.C., 259 F.3d 662, 664 (7th Cir. 2001), teaches:

> Whether a defendant's investigation is reasonable is a
> factual question normally reserved for trial; however,
> summary judgment is proper if the reasonableness of the
> defendant's procedures is beyond question.

Whether an investigation is reasonable hinges substantially on the amount of information regarding the nature of the

customer's dispute that a credit reporting agency relays to the furnisher of the disputed information (<u>Westra</u>, <u>id</u>.; see also this Court's opinion in <u>Jensen v. Peoples Gas Light & Coke Co.</u>, No. 04 C 2945, 2005 WL 2007123, at *3 (N.D. Ill. Aug. 16), explaining that "<u>Westra</u> makes clear that the information a credit furnisher receives about a dispute determines how an extensive an investigation must be to be considered reasonable"; <u>Schmit v. Trans Union LLC</u>, No. 03 C 1643, 2004 WL 785098, at *4 (N.D. Ill. April 12)).  Thus in <u>Westra</u>, where the furnisher of the information had received only "scant information...regarding the nature of Westra's dispute," our Court of Appeals readily concluded that Credit Control's relatively cursory investigation into the matter was reasonable as a matter of law (409 F.3d at 827):

> Credit Control received a CDV [consumer dispute verification form] from Trans Union indicating that Westra was disputing the charge on the basis that the account did not belong to him.  The CDV did not provide any information about possible fraud or identity theft or include any of the documentation provided to Trans Union by Westra.  Credit Control verified Westra's name, address, and date of birth and sent the CDV back to Trans Union.  Had Trans Union given Credit Control notice that the nature of the dispute concerned fraud, then perhaps a more thorough investigation would have been warranted.  Given the facts of this case, however, Credit Control's verification of Westra's information was a reasonable procedure.

In contrast, in <u>Jensen</u> this Court denied summary judgment where defendant Peoples Gas, also a furnisher of information, failed to present evidence as to precisely what a credit

reporting agency had asked it to verify after plaintiff Jensen
disputed information included in his credit report (2005 WL
2007123, at *3).  Jensen had taken issue with the fact that
credit reporting agencies were reporting that he had a delinquent
account with Peoples Gas when, as he contended, he had never
opened such an account (id. at *1).  On summary judgment Peoples
Gas contended that in the course of its investigation it
"match[ed] the information provided from Trans Union against
[Jensen's] data in its customer information system" and thus
confirmed that the credit report was accurate (id. at *3, second
alteration in original).  But that contention was unsupported by
evidence--in the form, for example, of a consumer dispute
verification form--of what Trans Union had specifically asked it
to verify (id.).  As a result Jensen, id. at *4 concluded:

> Any determination of the reasonableness of Peoples Gas'
> investigation in light of the information it possessed
> requires knowledge of what information it did in fact
> possess.  Because Peoples Gas has not shown what that
> information was, it has failed to carry its burden of
> establishing the absence of a genuine issue of material
> fact as to the issue of the reasonableness of its
> investigation.

Financial Services has been equally cryptic.  According to
its recitation of the facts, it received "a notice of Plaintiff's
dispute from a credit reporting agency" on three separate
occasions (F. St. ¶¶48, 50, 57)--but it has adduced no facts
regarding the precise content of those notices.  Jones' affidavit
is unilluminating, for she merely attests to receiving "notice"

and to the fact that in the course of conducting a routine investigation she "would compare [her] review of the customer's account with the information being provided to the consumer reporting agency" (W. Ex. 5 ¶¶28-30, 32, 34).  But nowhere in her affidavit does Jones explain just what information she was provided.  Finally, although the loan history notes do shed <u>some</u> additional light on what the credit reporting agencies communicated to Financial Services, those notes are properly read as just that--mere notes--rather than as a more complete account of the information shared.[10]

In the absence of some document such as an official consumer dispute verification form, or at the very least a more detailed representation of the nature of the notices received by Financial Services from the three credit reporting agencies with whom Whiting filed disputes, Financial Services has failed to shoulder its burden of establishing that no genuine issue of material fact exists as to the reasonableness of its investigation.  That

---

[10]  Specifically, the relevant loan history notes state "cust says was never late," "cust disputes status and amts," and "cust disputes acct status" (W. Ex. 5 at Ex. A, HDFSI/Whiting 000036-37, HDFSI/Whiting 000043).  But those conclusory statements do not speak, for example, to such a relevant matter as whether Whiting disputed the fact that he owed Financial Services $279.34, rather than $142.56, based on his assertion that he never received notice from Financial Services that he owed the larger amount while on active military duty.  If such information were included, it might have called on Jones--as part of a reasonable investigation--to look into whether Financial Services ever mailed Whiting a letter of the sort it contends it sent on October 6, 2005.

omission may well be curable, of course, and if so nothing would preclude Financial Services from filing another motion for summary judgment, this time with a more comprehensive record.

Whiting's Damages

Finally, Financial Services argues that summary judgment is appropriate because Whiting has failed to "show that he suffered any actual harm as a result of [Financial Services'] actions" (F. Mem. 8). In particular it maintains that Whiting was still able to obtain credit--as shown by the mortgage he secured for his new home--despite any alleged inaccuracies on his credit report (F. Mem. 9).

Whiting, on the other hand, maintains that he was aggrieved when Washington Mutual denied him credit (W. Add. St. ¶¶23-24), regardless of the fact that he was later able to secure a mortgage from another lender. Moreover, he maintains that he suffered emotional distress as a result of his credit dispute with Financial Services (W. Mem. 13-15).

To obtain an award of actual damages under the Act, Whiting must present evidence of "a causal relation between the violation of the statute and the loss of credit, or some other harm" (Crabill, 259 F.3d at 664). In addition, "[e]motional distress can, in certain circumstances, give rise to actual damages under the Act--even where there has been no denial of credit" (Wantz v. Experian Info. Solutions, 386 F.3d 829, 833 (7th Cir. 2004)).

22

When the claim rests on emotional distress, however, the
plaintiff carries a heavier burden than usual if he or she is to
survive summary judgment (<u>Sarver v. Experian Info. Solutions</u>, 390
F.3d 969, 971 (7th Cir. 2004)).  Specifically, plaintiff cannot
"rel[y] solely on his own conclusory statements of emotional
distress" to support his claim of harm (<u>Wantz</u>, 386 F.3d at 834).

     Whiting does not fail on that score.  In addition to his own
statements, he has also presented his father's testimony about
the emotional distress he manifested as a result of his dispute
with Financial Services.  Testimony from a relative has been
found sufficient to stave off summary judgment in other actions
brought under the Act.  In <u>McKeown v. Sears Roebuck & Co.</u>, 335
F.Supp.2d 917, 933 (W.D. Wis. 2004), for example, plaintiff
"relie[d] on the testimony of his wife regarding the frustration
and anxiety he suffered for fear that he would lose the property
he wished to purchase and that the error might cause other credit
related problems."  To be sure, <u>McKeown</u>, <u>id</u>. at 933-34 expressed
some doubt regarding the intensity of plaintiff's emotional
distress based on the evidence before it--yet the court
ultimately concluded that "evaluation of plaintiff's emotional
distress claim is a task best left to the jury," thus denying
summary judgment (<u>id</u>. at 934).

     This Court reaches the same conclusion.  Although there is
evidence that other factors aside from his dispute with Financial

Services contributed to Whiting's emotional distress (a fact that even Whiting concedes), summary judgment is not the appropriate vehicle for determining the extent to which the claimed emotional distress was ascribable to Whiting's credit dispute. As did McKeown, this Court leaves that assessment to a jury.

## Conclusion

There is no genuine issue of material fact as to whether Financial Services willfully violated Section 1681s-2(b), so that Financial Services' motion for summary judgment on that contention is granted. There are, however, genuine issues of material fact as to whether Financial Services negligently violated the same statute and as to whether Whiting suffered emotional distress as a result. And that being so, Financial Services' motion for summary judgment on the issue of negligent noncompliance is denied.[11] This action is set for a next status hearing at 9 a.m. February 13, 2008 to discuss the procedures and

---

[11] Even though Whiting has thus dodged the summary judgment bullet in part, this Court's extended excursion through the evidence adduced by the parties compels it to comment on the unreasonableness (on the part of a party insisting on reasonable conduct from his adversary!) of Whiting's flat-out rejection of Financial Services' effort to resolve the matter shortly before suit was filed (Anisio-Fowler's July 7, 2006 letter to Whiting's counsel). That rejection has made it impossible to tell whether bridging the gap between the parties could have been accomplished without a lawsuit--perhaps with the use of the funds that have since been expended in discovery procedures and on the current motion. In candor, the effort to grab the brass ring under the circumstances recounted in this opinion does little credit to Whiting and his counsel.

scheduling for resolution of the case at trial.

_____
Milton I. Shadur
Senior United States District Judge

Date:  February 7, 2008